AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

OLAJAWUN STEVESON HUDSON,

Defendant(s)

Case No.

19 MJ04676

*FILED*
*CLERK, U.S. DISTRICT COURT*
NOV - 4 2019
*CENTRAL DISTRICT OF CALIFORNIA*
BY _____ DEPUTY

ORIGINAL

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 3, 2019, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Marlon O. Coronado, Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/4/19

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

1236

Scott Dubois x0882

**AFFIDAVIT**

I, Marlon Coronado, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against OLAJAWUN STEVESON HUDSON ("HUDSON") for a violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance).

2. This affidavit is also made in support of an application for a warrant to search a black colored ZTE, model Z851, cellular telephone (the "SUBJECT DEVICE"), in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in draft form, in substance, and in part only.

## II. BACKGROUND OF AFFIANT

5. I have been a Los Angeles Airport Police Department ("LAXPD") Officer since June 2004. I have been assigned to the DEA as a sworn Task Force Officer ("TFO") since July 2015. I am currently assigned to the DEA Los Angeles Field Division, Los Angeles International Airport Narcotics Task Force.

6. The Narcotics Task Force is an inter-agency task force based at Los Angeles International Airport ("LAX"). In addition to the DEA, the Narcotics Task Force includes LAXPD, the Los Angeles Police Department, and the Los Angeles County Sheriff's Department. The Narcotics Task Force also works closely with the United States Customs and Border Protection, the Transportation Security Administration ("TSA"), the Department of Homeland Security, and the Federal Bureau of Investigation. All of the aforementioned agencies recognize the need for a coordinated law enforcement effort to target airport/airline internal criminal enterprises that use the aviation system to transport large amounts of illicit drugs throughout the United States, and throughout the world.

7. From June 2014 through June 2015, I was assigned to Homeland Security Investigations ("HSI") as a TFO. While assigned to HSI, I participated in several drug investigations, involving the unlawful importation, exportation, possession with intent to distribute, and distribution of controlled substances,

as well as the related laundering of monetary instruments, and the conducting of monetary transactions involving the proceeds of specified unlawful activities.

8. Based on my training and experience, I am familiar with the methods of operation of narcotics traffickers, including the importation, exportation, distribution, transportation, and storage of controlled substances, as well as the collection of money proceeds of drug trafficking, and methods of money laundering used to conceal the nature of the proceeds. I am also familiar with the methods of drug-trafficking organizations, including the distribution, storage, and transportation of controlled substances, as well as the collection of proceeds of drug trafficking and methods of money laundering used to conceal the nature of those proceeds. During my career, I have participated in a variety of drug investigations ranging from simple possession to complex international conspiracies. I have also participated in the execution of search warrants, conducted physical surveillance, reviewed video surveillance, spoken to confidential informants, interviewed suspects, and discussed drug investigations with other experienced drug investigators concerning the methods and practices utilized by drug traffickers.

### III. SUMMARY OF PROBABLE CAUSE

9. On November 3, 2019, TSA officers found two packages containing a white powdery substance resembling cocaine and one package containing a white powdery substance resembling fentanyl, with a gross weight of approximately 3.57 kilograms,

concealed within layers of clothes in HUDSON's suitcase. At the time the packages were discovered, HUDSON was aboard a Delta Airlines flight destined from LAX to New Orleans, Louisiana. Following the discovery of the packages, HUDSON was removed from the aircraft and arrested, and the SUBJECT DEVICE was seized from his person. A presumptive field test of the substances in the packages was positive for cocaine and fentanyl.

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Discovery of Cocaine and Fentanyl in HUDSON's Bag

11. From an LAXPD report written by Officer Raul Reyes and my conversations with LAXPD Officers Reyes and Manuel Franco, I learned that, on November 3, 2019, at approximately 8:58 a.m., an x-ray machine in a TSA luggage screening room alerted TSA Officer Joshua Hwang to a "non-rigid object" inside a pink colored "MOTUS" brand travel roller bag. TSA Officer Hwang alerted other officers to the suspicious item and sent the bag for a secondary screening.

12. TSA Officer Shanina Nickson checked the right side of the bag where she discovered a brick sized package wrapped in clear plastic inside a pair of jeans. TSA Officer Nickson then checked the left side of the roller bag where she discovered a second brick sized package wrapped in clear plastic. TSA Officer Nickson met and notified Supervisor Sergio Suarez of her findings.

13. Supervisor Suarez joined in the search and discovered a third brick sized package wrapped in clear plastic and covered with clothing. Supervisor Suarez swabbed the packages for explosive material, which returned negative results. Based on his training and experience with narcotics, Supervisor Suarez suspected the packages could contain narcotics and contacted LAXPD for further investigation.

14. At approximately 9:10 a.m., Officers Reyes and Franco arrived and observed the three kilogram sized packages. The roller bag had a Delta Airlines luggage tag #60006358027, bearing HUDSON's name and Delta Airlines Flight Number 0835 from LAX to New Orleans, Louisiana.[1] Based on the packaging and amount of narcotics discovered in the roller bag, Officers Reyes and Franco requested that DEA respond for further investigation.

15. At approximately 9:20 a.m., Officers Reyes, Franco, and others responded to departing gate 33 in order to locate HUDSON. The officers discovered HUDSON onboard the Delta Airlines aircraft and had a Delta Airlines representative request that HUDSON come to the front of the plane. HUDSON complied holding his boarding pass, California Identification Card, and the SUBJECT DEVICE. HUDSON's boarding pass and

---

[1] Based on my knowledge and experience of Delta Airline's standard practices at LAX, the passenger whose name is on the ticket and baggage tag must be physically present and provide a valid photo identification matching their name and date of birth on the reservation in order to check a bag or suitcase, at which point that passenger's name (and not someone else's) will be printed on the bag tag that is then immediately affixed to the bag or suitcase. The identification of HUDSON's name on the suitcase, in my experience, therefore means that HUDSON checked the suitcase in person with Delta Airlines upon arriving at LAX.

California Identification Card matched the name on the tag of the pink roller bag.

16. At approximately 10:30 a.m., Officers Reyes and Franco transported the suspected narcotics, roller bag, the SUBJECT DEVICE, and HUDSON to the Narcotics Task Force office.

17. At the Narcotics Task Force office, I tested the three clear plastic wrapped packages found in HUDSON's suitcase using the TruNarc Raman spectrometer. I found that two of the packages containing a white powdery substance tested positive for cocaine and the third package, which also contained a white powdery substance, tested positive for fentanyl. The two packages containing cocaine weighed 2.36 kilograms (including packaging), and the package containing fentanyl weighed 1.21 kilograms (including packaging).

**B. HUDSON Admitted Transporting Narcotics**

18. I read HUDSON his Miranda rights, and HUDSON then waived his rights in writing and agreed to speak with me and the other officers. HUDSON refused in writing to permit his interview to be video recorded.

19. HUDSON stated that, on or about, November 1, 2019, HUDSON's friend "Dominick" offered to take him on an all-expenses paid trip to New Orleans. HUDSON agreed to go the trip as long as he was back by Monday, November 4, 2019. HUDSON stated that he used the SUBJECT DEVICE to communicate with "Dominick" regarding their trip to New Orleans.

20. On Saturday, November 2, 2019, HUDSON texted "Dominick" his personal information in order for "Dominick" to

purchase HUDSON's ticket. On the same date, "Dominick" and an unidentified black male picked up HUDSON at his residence. The unknown man drove "Dominick" and HUDSON to a Motel 6, located at 5101 West Century Blvd, Inglewood, California 90304, in a black, newer model Mercedes-Benz. "Dominick" and HUDSON had dinner, smoked marijuana, and spent the night in room 518.

21. On Sunday, November 3, 2019, HUDSON received a text message from Delta Airlines with his flight reservation. A second unidentified black male driving a newer model Lexus or Mercedes-Benz picked up "Dominick" and HUDSON at the Motel 6 and drove them to an LAX shuttle bus depot. While at the shuttle bus depot, "Dominick" handed HUDSON the pink colored "MOTUS" roller bag. Both "Dominick" and HUDSON then took a shuttle bus to LAX terminal 3. "Dominick" instructed HUDSON to check in the roller bag and told HUDSON that he would meet HUDSON in New Orleans. "Dominick" added that his flight to New Orleans was scheduled to take off an hour after HUDSON's flight. "Dominick" said that he was going back to the Motel 6 to pick up clothes he had left behind.

22. HUDSON stated that he thought the pink roller bag contained marijuana when he checked it. I am informed that LAX security footage captured HUDSON checking the pink roller bag as his only piece of luggage.

23. HUDSON also gave written consent for law enforcement to search the SUBJECT DEVICE. Officers previewed the phone based on consent, but this affidavit does not rely on the contents to establish probable cause. HUDSON stated that he had

7

obtained the SUBJECT DEVICE via the "Obama program" on or about October 31, 2019.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

24.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

25. As used herein, the term "digital device" includes the SUBJECT DEVICE.

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

   a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a short period of time for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28. Other than what has been described in this affidavit, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. **CONCLUSION**

29. For all of the reasons described above, there is probable cause to believe that HUDSON has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the

11

items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

_____
MARLON CORONADO
Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn before me this 4 day of November, 2019.

_____
THE HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE